## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### NORTHERN DIVISION

SABRINA GRANDBERRY,

      Plaintiff,                     CASE NO. 04-CV-10348-BC

v.                                  DISTRICT JUDGE DAVID M. LAWSON
                                  MAGISTRATE JUDGE CHARLES BINDER

JUDSON CENTER,

      Defendant.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
### ON DEFENDANT JUDSON CENTER, INC.'S
### MOTION FOR SUMMARY JUDGMENT
(Dkt. 18)

## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendant's Motion for Summary Judgment be **GRANTED.**

## II.    REPORT

### A.    Introduction

Pending, pursuant to an Order of Reference from United States District Judge David Lawson, is the above-entitled motion. Plaintiff filed a response opposing the motion, along with exhibits (Dkts. 23 & 25), and Defendant filed a reply with additional exhibits. (Dkt. 26.) Oral argument was heard on December 9, 2005, and thereafter an Order for Further Proceedings was issued allowing the parties to file supplemental pleadings. Plaintiff filed a supplement on December 14, 2005 (Dkt. 28), and Defendant filed its reply to Plaintiff's supplement on December 18, 2005. (Dkt 29.)

### B.      Background

Plaintiff filed the instant complaint on December 13, 2004.  The only defendant is the Judson Center, which Plaintiff states is a  a non-profit Michigan corporation "that is contracted by the State of Michigan."[1]  (Compl., Dkt. 1, ¶ 7.)  Plaintiff, an African American woman, alleges that she was employed with Defendant, but does not specify when that employment began.  Defendant states that Plaintiff was hired by the Judson Center in early January 2003 as a Foster Care Case Manager at the Redford, Michigan, office.  (Def.'s Mot., Dkt. 18 at 2.)   Exhibits attached to the instant motion indicate that Plaintiff executed an at-will employment agreement on January 3, 2003.  (*Id.*, Ex. A.)  Plaintiff alleges that prior to November 2003, Defendant "had no complaints with Plaintiff's work."  (Compl. ¶ 8.)  Defendant denies this allegation.  (Answer, Dkt. 2 ¶ 8.)

Plaintiff states in her complaint that in November 2003 she injured her ankle which restricted her ability to carry out her duties.  (Compl. ¶ 9.)  Plaintiff alleges that Defendant thereafter "required Plaintiff to provide over-extensive documentation for said injury," a requirement not imposed upon at least one similarly situated white male employee.  (*Id.* ¶¶ 10 & 11.)  Plaintiff alleges that she protested this discriminatory treatment, and later in November 2003 filed a racial discrimination charge with the Detroit office of the Michigan Department of Civil Rights.  (*Id.* ¶ 13; *see also* Def.'s Mot., Dkt. 18 at Ex. E.)  Plaintiff contends that subsequent to the filing of her discrimination charge, she became the victim of unlawful retaliation in that Plaintiff's supervisor became "hypercritical of Plaintiff's work," and "called Plaintiff's clients homes to

---

[1]Besides characterizing Defendant as a Michigan non-profit corporation, neither party describes the activities and purposes of Defendant in any particular detail.  In the motion, Defendant states that it is a "Michigan non-profit corporation that provides foster care services and placements for children." (Dkt. 18 at 2.)  Nowhere in Plaintiff's response is the Judson Center described, nor are Plaintiff's exact employment duties specified.   Additional Information about the defendant is available on the Internet.  (*See* www.Judsoncenter.org.)  As will become evident, *infra*, Judson Center also does considerable work for the Michigan Family Independence Agency.

check up on her." (*Id.* ¶¶ 15 & 16.) She asserts that other similarly situated employees were not treated in this manner. Plaintiff alleges that she was summarily terminated without due process in March 2004 and that she timely filed charges of racial discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). (*Id.* ¶¶ 17 & 18.)

Plaintiff's complaint asserts violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; Michigan's Elliott-Larsen Civil Rights Act, MICHIGAN COMPILED LAWS § 37.2101 *et seq.*; and 42 U.S.C. § 1983. Specifically, the complaint contains seven counts: violation of Title VII – disparate treatment (Count I), violation of the Elliott-Larsen Civil Rights Act – disparate treatment (Count II), unlawful discrimination under Title VII (Count III), unlawful retaliation in violation of the Elliott-Larsen Civil Rights Act (Count IV), racial harassment in violation of the Elliott-Larsen Civil Rights Act (Count V), racial harassment in violation of Title VII (Count VI),[2] and discrimination and retaliation in violation of 42 U.S.C. § 1983 (Count VII).

Defendant answered Plaintiff's complaint on January 18, 2005, denying all of the substantive allegations. The instant motion followed on October 21, 2005.

**C.    Facts**

**1.    Plaintiff's Injury and Her Work Schedule**

Plaintiff testified in her deposition that she injured her ankle in late 2003. (Dkt. 18, Ex. B, Grandberry Dep. at 45.) Plaintiff's complaint states that this took place in November 2003. (Compl. ¶ 13.) Plaintiff testified that thereafter she was placed on medical restrictions which she presented to Judson Center. (Grandberry Dep. at 46.) Plaintiff stated that she was also prescribed physical therapy which was to begin on November 26, 2003. Prior to the beginning of therapy,

---

[2]This count is inadvertently labeled "V" in Plaintiff's complaint.

3

Plaintiff recounted receiving a memorandum from her supervisor, Colleen Doyle.  (*Id*. at 48-49;

*see also* Ex. C.) The memorandum is dated November 21, 2003, and states:

> I have received written confirmation of your physical restriction from your doctor's
> office.  It is anticipated that you will be restricted to your desk for at least one more
> week.  During that time, it is expected that you will be in the office for our regular
> business hours, 8:30 am - 5:00 pm.  If you have a visit that requires you to stay past
> 5:00 pm, you may adjust your schedule to account for this.
>
> On both Tuesday, 11/18/03 and Friday 11/21/03, you did not arrive to the office
> until approximately 10:30 am.  Further on that Friday you also left the office at
> about 1:30 pm.

(Dkt. 18 at Ex. C.)

Plaintiff does not refute the factual accuracy of these statements.  Rather, Plaintiff testified

that these statements evidence the fact that she was being improperly "watched" by Kathleen

Schoenherr, an adoption supervisor, which she characterizes as "another form of harassment[,]"

since Ms. Doyle was not in the office on these days.  (Grandberry Dep. at 49.)  The memo goes

on to state:

> Please be aware that this time will be adjusted on the next timesheet.  It is Judson
> Center policy that you must call and speak to a supervisor if you are going to be
> more than a few minutes late.  Further you must have approval from a supervisor to
> leave the office at any time that is different than your approved quitting time/weekly
> schedule. Also please remember that all schedules are to be submitted and approved
> by me.  If attendance continues to be a problem further disciplinary action up to and
> including termination of employment will be taken.

(Dkt. 18 at Ex. C.)

Plaintiff testified that other employees left early on November 21st and were not disciplined

as a result.  Plaintiff named Kyana Magee Houston and Monique Dixon.  (Grandberry Dep. at 54-

55.)  Plaintiff acknowledged, however, that neither of these employees were under Ms. Doyle's

supervision.  (*Id*. at 55.)  The memo goes on to state:

4

Finally, I need prior notice for any planned absences. I was unaware that you had a scheduled doctor appointment this past Thursday morning, (11/20), and see by your schedule that you have an appointment scheduled for next Wednesday, (11/26). *Please make some time available on Monday so that we may discuss your schedule for the week.*

(Dkt. 18 at Ex. C (emphasis in original).) Attached to the memorandum are Judson Center policy statements relating to employee attendance. (*Id.* at Ex. D.)

Plaintiff testified that she was aware of Judson's requirement that she post her schedule weekly. (Grandberry Dep. at 51.) She explained that this was done by attaching the schedule to her cubicle and on Ms. Doyle's door. Plaintiff testified that "[d]ue to the fact I was on crutches, having a big heavy boot on my left ankle, it was hard for me to get around." (*Id.*) As a result, Plaintiff sent Ms. Doyle the schedule via e-mail, and Ms. Doyle "refused to accept that." (*Id.*)

In her affidavit, Colleen Doyle addresses this issue. She states that flex time can be approved beforehand by a supervisor and that:

Case Managers need to post a schedule for the week so that their whereabouts are known. Ms. Grandberry wanted to e-mail a daily schedule and this is unacceptable because the schedule needs to be posted on Friday before or Monday morning of that week, because other employees need to see it in case I am not there and they need to review it. This was stated to Ms. Grandberry in writing.

(Def.'s Reply, Dkt. 26, Ex. B, Doyle Aff. ¶ 6.)

Three days later, Ms. Doyle presented to and discussed with Plaintiff her annual Case Manager Performance Evaluation. (Pl.'s Supp., Dkt. 28 at Ex. 1.) The evaluation had apparently been completed earlier, as it bears the same date as Plaintiff's tardiness and Ms. Doyle's memo, November 21, 2003. All performance measures were checked as "in compliance" with the exception of a requirement that the Family Independence Agency ("FIA") be notified prior to the emergency move of a foster child and the completion of eight weeks of training at the FIA Child Welfare Institute. (*Id.*) As to the first matter, the evaluation reflects that, in one of Plaintiff's

5

cases, FIA was notified prior to the move but it was not documented within the required 14 days. As to the Welfare Institute training, the evaluation notes that Plaintiff had been wait-listed for the training and had completed it within eight months of hire.  Comments to the report state:

> Sabrina possesses good time management skills.  She is able to effectively manage her case load.  This past year, Sabrina has had some difficulties working with a foster parent as well as having some conflicts with a co-worker.  It should be noted that foster parents rated Sabrina above average on the satisfaction surveys.

(*Id*. at 3.)  Ms. Doyle listed continuing to build positive relationships with foster parents and co-workers as objectives for the coming year.  (*Id*.)

Other incidents relating to the posting of Plaintiff's weekly schedule are summarized in a memorandum dated March 8, 2004, from Ms. Doyle to Sue Benson, Doyle's supervisor.[3]  Ms. Doyle stated that the matter had become an issue because Plaintiff was often missing scheduled meetings and Ms. Doyle was unaware of Plaintiff's whereabouts.  As an example, Ms. Doyle cited January 29, 2004, when Plaintiff did not arrive at the office until approximately 2:30 in the afternoon.  According to Ms. Doyle, since Plaintiff did not have her schedule posted, Ms. Doyle "had no way of determining where she was, what time she would be in the office, or if she was even working on that day.  On that day she [Plaintiff] missed a mandatory case manager meeting."  (Dkt. 18, Ex. G at 2.)  According to Ms. Doyle, when Plaintiff arrived at the office, she stated that she "had attempted to complete a home visit, but had gotten lost, and had attended a meeting at Redford High School."  (*Id*.)  Ms. Doyle sought to verify Plaintiff's activities that day.  She was able to confirm that Plaintiff attended the meeting at the school which lasted approximately one hour.  Ms. Doyle then states that this left "about four hours of unaccounted for time, in which Ms.

---

[3]This memorandum is dated three days before Plaintiff's termination and discusses numerous topics relating to Plaintiff's performance.  Portions of the memorandum will be cited throughout this Report and Recommendation.

Grandberry claimed to have been lost and searching for a foster home, at which she did not have a scheduled appointment." (*Id.* at 2.) The following Monday, Ms. Doyle recounts that Plaintiff e-mailed a daily "itinerary" to her. Ms. Doyle stated that she responded by reminding Plaintiff that a weekly schedule was needed, with which Plaintiff complied two days later after a second e-mail request. (*Id.*) Ms. Doyle further informed her supervisor that, in early March, she again did not receive a weekly schedule from Plaintiff until Wednesday of that week.

At her deposition, Ms. Doyle described her general handling of such issues, stating that she would not issue verbal reprimands to employees coming late or leaving early unless "it happened on a regular basis or if it happened more than once." (Dkt. 26, Doyle Dep. at 40.)

### 2. Preparation of Reports

Plaintiff received a written reprimand dated December 9, 2003, regarding a court report said to have been submitted late. The reprimand from Ms. Doyle states in pertinent part:

> On December 8, 2003 at about 2:30 pm this supervisor approached Ms. Grandberry and found that she had yet to begin preparing a court report for a hearing that was scheduled for December 9, 2003. Ms. Grandberry was instructed to begin working on the court report. This supervisor left for the day at about 5:00 pm, and the report had not been finished. At about 6:30, another supervisor asked Ms. Grandberry for the report, it was proofed and returned to her for corrections. The report was submitted to the Program Manager on 12/9/03 for final signatures. The report was then faxed to FIA for approval, however, the FIA worker refused to sign the report due to the short notice. Subsequently, the report was submitted to the court without FIA approval.
>
> Court reports are due: to the immediate supervisor two weeks before the scheduled court date, to FIA five business days before the court date, and to the court two business days prior to the hearing date.

(Def.'s Mot., Dkt. 18 at Ex. F.)

7

In her deposition, Plaintiff explained that she sent an e-mail[4] to Colleen Doyle asking her whether "she was going to do the court report, because she attended court before." (Grandberry Dep. at 58.) Plaintiff testified that she received a response informing her that it was her responsibility. (*Id*. at 59.) Plaintiff then stated, "I had no pertinent information to base my court report on and she didn't have it and another supervisor who had the case before I did, was passed on to me, she e-mailed me corresponding information that I needed to fill out the court report. All of this was getting late for me to do the court report. So I did the best that I could with it." (*Id*.) Plaintiff agreed that the individual at issue was one of her foster care clients. Plaintiff stated that the report was necessary for an upcoming court hearing. (*Id*. at 59-61.)

Plaintiff further testified that the two-week requirement was consistent with her understanding of Judson policies. (*Id*. 61-62.) She explained that she was behind in her work during this period, stating that "things got piled up and I couldn't catch up and then I questioned her [Doyle] about this, and she denied to help me in this court report." (*Id*. at 62.) Plaintiff testified that Ms. Doyle knew that she was late in submitting the report and felt that Ms. Doyle could have assisted her since she had attended a prior court hearing. (*Id*.)

The record shows, however, that on December 8, 2003, the day prior to the issuance of the written reprimand, Ms. Doyle sent an e-mail to Plaintiff stating, "Court reports are due two weeks before the court date. I know that you are behind due to your being off sick, however, turning in a court report the afternoon before the court date is unacceptable. If you needed assistance, I could have helped you instead of your waiting until this afternoon to begin writing the court report." (Def.'s Reply, Dkt. 26 at Ex. C.)

---

[4]I am unable to find a copy of this e-mail in the exhibits presented.

During her deposition, Plaintiff acknowledged that Judson's policy was that reports were to be submitted to immediate supervisors two weeks before a scheduled court date, to the FIA five business days before the court date, and to the court two days prior to the hearing date. (Grandberry Dep. at 61.)   Plaintiff admitted during her deposition that she did not advise her superiors that she was having trouble getting this court report completed on time.  (*Id.* at 63.) Plaintiff stated that Ms. Doyle "knew it was late."  (*Id.*)  During her deposition, Plaintiff reiterated that she did not have the information necessary to prepare the report.

Plaintiff stated that she felt that this "was all a set-up to have my court report late[.]"  (Dkt. 28, Ex. 3 at 3.)  Plaintiff stated that the next morning, she asked a senior case supervisor to look over the report, and later that day Plaintiff endeavored to call a FIA worker for an apparently required counter signature.  Plaintiff then stated:

> When myself and Ken Clark were hired there we were told that if a court report was not signed there would be no court hearing and it was up to the supervisor (FIA) to make the decision of going forward with it or not.
>
> Case Managers aren't allowed to phone FIA supervisors, only the supervisors of case managers are allowed to do so.  Apparently, Ms. Doyle and Sue Benson failed to do their job and advise the FIA supervisor of the lateness of this report and get his/her signature.  Instead, I went to court without a FIA signature on a worthless court report that the FIA worker didn't read let alone sign.

(*Id.* at 4.)

In the memorandum dated March 8, 2004, to Ms. Benson, Ms. Doyle described a series of incidents in which corrections or additional information was requested, and "rather than responding by incorporating the requested information . . . she has resubmitted the reports without making the corrections, has simply written a reply on the report, or has refused to make the corrections." (Dkt. 18, Ex. G at 3.)  According to Ms Doyle, in one report, Plaintiff had written that a birth mother's parenting skills had "improved."  When Ms. Doyle inquired as to the basis

underlying this assessment, Plaintiff submitted a second draft changing the word "improved" to "consistent" without any explanation of the basis for that assessment. Plaintiff was also asked to include in a report the fact that she had sent a copy of an agency agreement to a father. (*Id*.) Plaintiff submitted a second draft incorporating this change, and then submitted a third draft in which apparently the change had not been incorporated, but Plaintiff had simply written the word "yes" when asked whether the agreement had been sent. Plaintiff was also asked in this report to include the results of drug screens as part of her recommendations, but this information likewise was not included in the subsequent draft.

In another report, Ms. Doyle noted that information regarding the children in the report was not up to date. In reviewing a series of reference documents relating to the children, Ms. Doyle discovered that most of the information on those reports was identical. (*Id*.) When asked about this, Ms. Doyle returned these reports to Plaintiff with the direction that she rewrite them and update each section. According to the memo, Plaintiff was told that "even if the information is basically the same, she [Plaintiff] should not repeat information verbatim from report to report." (*Id*.) Plaintiff submitted a second draft, and according to Ms. Doyle, many of the corrections were not made, as Plaintiff indicated that she did not need to update this information because she had just done it earlier. (*Id*.)

In another report, Ms. Doyle asked for supplementation regarding a foster parent's concerns about a foster child's speech development. Instead of incorporating the information into the report, she simply hand-wrote it next to Ms. Doyle's notes. (*Id*.) After Plaintiff submitted a second draft without the requested corrections, Ms. Doyle states that she simply made the changes herself. (*Id*.)

Ms. Doyle next cites a court report in which she had inquired if counseling had been required for a parent, but Plaintiff simply crossed the question off and did not include that

information in her corrected report.  Ms. Doyle recounts that she made the corrections herself. (*Id.*

at 4.)  She also describes a court hearing which apparently she had attended earlier that same day.

Ms. Doyle recounts that when the case was last discussed with Plaintiff, Plaintiff advised her that

a permanent custody petition had been dismissed.  During the hearing, Ms. Doyle states that she

learned that this was not accurate.  An attorney apparently told Ms. Doyle that a previously-

scheduled hearing on the matter had been adjourned because Plaintiff "was not prepared to testify,"

telling the attorney that Plaintiff "had 'no data' regarding the drug screens for mother, and that she

had not been to the mother's home."  (*Id.*)  According to Ms. Doyle, "[f]ortunately, I had

information that the mother had continued to make progress and therefore the petition was

dismissed.  Had that not been the case, the hearing would have been adjourned and rescheduled

since Ms. Grandberry had not notified me that the issue of permanent custody was the subject of

the 3/8/04 court session."  (*Id.*)

Ms. Doyle next describes another court report where Plaintiff indicated that the client was

in compliance with drug screening requirements, while on a previous draft Plaintiff had indicated

that the client was not in compliance.  Plaintiff is said to have simply responded by writing,

"apparently, things changed as I've stated[.]" (*Id.*)  Plaintiff apparently gave no other explanation

to Ms. Doyle.  (*Id.*)

### 3.      Complaints to Michigan Department of Civil Rights and EEOC

Because Plaintiff believed as a result of the incidents in late November 2003 that her pay

was going to be reduced ("docked"), she shortly thereafter filed a charge[5] with the Michigan

---

[5]During Plaintiff's deposition, when referring to her filings with the Michigan Department of Civil
Rights and the Equal Employment Opportunity Commission, the term "complaint" is consistently used.

11

Department of Civil Rights.  (Grandberry Dep. at 53.)  A response from the Department of Civil

Rights summarizes Plaintiff's charge as follows:

> I am a Black woman and I believe I have been harassed and had my pay docked
> because of my race.
>
> I began working for the respondent on January 3, 2003, as a foster care case
> manager.  In May 2003 I began to be harassed by a new supervisor.  I am the only
> Black employee under her supervision.  She constantly checks on me.  The White
> employees are not harassed in this manner.  On November 21, 2003, many co-
> workers and myself left work early.  I was the only employee whose pay was
> docked.

(Pl.'s Supp., Dkt. 28 at Ex. 4; *see also* Dkt. 18 at Ex. E.)

Apparently attached to this charge was a seven-page memorandum written by Plaintiff on

Judson Center letterhead, addressed to Henry K. Gordon, another Judson employee, and dated four

days before the earlier-described performance evaluation, also the day before Plaintiff arrived late

to work. The memo is entitled "Re: Workplace Discrimination and Harassment."  (Dkt. 28 at Ex.

2.)  The memorandum begins with a section entitled "Discrimination" and states among other

things that from "May to the present I have been talk[ed] about and checked up on behind my back

[by a] co-worker named Angela Spuck."  (*Id.*)

The next section of the memo is entitled "Skipped Over for Promotion" and states that an

opening for an intake worker was filled by "a case manager who hasn't been there for three

months[.]"  (*Id.* at 2.) Plaintiff states that a previous supervisor had told her that another supervisor

"did not like me and any promotion I seek I wouldn't get."  (*Id.*)  Plaintiff goes on to state:  "I

found this to be true by the way she would look at me.  Her face showed a total dislike of me."

(*Id.*)  Plaintiff states that upper level supervisors "only promote those they liked."  (*Id.*)

Plaintiff next describes problems relating to her accumulation of flex time.  Plaintiff states

that she recently received notification that she could only accumulate 16 flex hours but that other

employees were allowed over 100 hours, and then asks, "Why haven't they all fall[en] under these same guidelines?"  (*Id*. at 3.)  Plaintiff then discusses what she calls "secret promotions," describing additional duties for Angela Spuck which Plaintiff believed amounted to a de facto promotion of Ms. Spuck even though she "does not do her home visits as required." (*Id*.)  Plaintiff felt these actions were discriminatory practices.  (*Id*.)

Plaintiff's next section of the memo is entitled "Harassment" and describes telephonic and other inquiries from Ms. Doyle and Mr. Cable (a Caucasian) relating to her injury.  Among other things, Plaintiff recounts that "Ms. Doyle further stated that I've hurt myself and this is unusual. Further, she stated the reason she's calling me is that Bob [Cable] returned the sick note from my doctor back to her telling her that I need a more detailed description of the restrictions that my doctor has put on me.  He also told Ms. Doyle that since I can drive to work and be put on crutches, he couldn't understand why there were restrictions." (*Id*. at 4.)  Plaintiff states, "I have plenty of sick time in my bank and he is deliberately harassing me and I will not stand for this any further."  (*Id*. at 5.)  Plaintiff states that she has requested relief under the Elliott-Larsen Civil Rights Act, as well as protection under Michigan's Whistle Blower Act.

Plaintiff's memo next addresses "Discrimination," describing several visits by Plaintiff's fiancé to her place of work in October.  Plaintiff states that remarks relating to these visits by Mr. Cable were "insulting, offensive and very unprofessional."  (*Id*. at 5-6.)  Plaintiff states that Cable was "pointing fingers at certain individuals only and making up rules as he go [sic] to suit his prejudice to harass." (*Id*.)

Plaintiff next describes the November 21, 2003, memorandum and again expresses concern that her pay is being docked.  (*Id*. at 6.)  Plaintiff concludes by stating that she is "the one that is singled out, I submit that I am being harassed by Colleen Doyle . . . Bob Cable . . . and Susan

13

Benson [a Caucasian] . . . ." (*Id.*) The memo indicates that copies were forwarded to the Michigan Department of Civil Rights, the EEOC, the U.S. Department of Labor, and to an attorney. (*Id.* at 7.)

During her deposition, Plaintiff testified that after she had filed the November 2003 civil rights charge, she was the object of "micromanagement," which she described as "trying to find out my whereabouts through other employees, having me watched by supervisors and other employees, calling foster parents behind my back, trying to see whether or not I have made home visits and then telling them not to tell me, [and] inconsistent supervision. . . ." (Grandberry Dep. at 64.) Plaintiff testified that Ms. Doyle's supervisor, Susan Benson, offered to investigate, but Plaintiff declined the invitation, stating, "I didn't approve of that because Miss Benson and Miss Doyle were friends, because they knew each other from a prior work. She worked together before and they were friends. So I wasn't comfortable with her doing the investigation." (*Id.* at 68.)[6] Plaintiff also testified that one of the supervisors watching her was named Robin. (*Id.* at 65-66.) Plaintiff believed that an employee whose cubicle was next to hers was listening in on her conversations. (*Id.* at 66.) Plaintiff elected not to confront these co-workers. (*Id.* at 66-67.) Plaintiff testified that in February 2004 she was notified that her November 2003 civil rights charge had been dismissed. (Grandberry Dep at 57-58.)

In mid-December 2003, Plaintiff wrote a letter to Robert Stark, Judson's Human Resources Director, setting forth a series of grievances. (Grandberry Dep. at 70-71.) Plaintiff later sent copies of this letter to the EEOC and the Michigan Department of Civil Rights. (*Id.* at 72-73.) This letter appears to have formed the basis for a second charge with the Michigan Department of

---

[6]From the context of her testimony, it appears that Plaintiff is referring to her first civil rights charge filed in November 2003.

14

Civil Rights.[7]  (*See id.*)  The exhibits attached to Plaintiff's supplemental filing indicate that the December memo mentioned by Plaintiff in her deposition is dated December 12, 2003, and is entitled "Retaliation, Harassments and Threats."  (Dkt. 28, Ex. 3 at 1.)  In it, Plaintiff cites a recent discrimination complaint she had filed against Ms. Doyle, as well as a second one against Mr. Cable.  Plaintiff describes an incident on November 21, 2003, when Ms. Doyle interrupted her and discussed with her in front of two co-workers apparent complaints from a foster care client.  Plaintiff states that Ms. Doyle started "telling me what she didn't like in front of these two co-workers trying to belittle and embarrass me.  Then after all of that accusation in front of these co-workers, she found that it wasn't true."  (*Id.* at 2.)  Plaintiff next describes the meeting on December 12, 2003, with Sue Benson, a program director, relating to a previous complaint Plaintiff had made.  Plaintiff recounts that Mr. Cable interrupted this meeting and stated that "it seemed to him that 'I'm trying to get myself fired, based on how I was treating Ms. Doyle, the two reports that was [sic] late because of my injury, that I wasn't a team player, and how I was treating my co-workers. . . ."  (*Id.*)  Plaintiff states that Mr. Cable and Ms. Benson "are retaliating against me by harassingly nit-picking things that I do which was not an issue before."  (*Id.*)

In the December 12, 2005, memo, Plaintiff next discusses the previously-described written reprimand which she characterized as "without merit and completely retaliatory."  (*Id.* at 3.)  Plaintiff notes that she e-mailed Ms. Doyle asking if she was writing the report and received a response expecting her to handle the case even though she had not e-mailed the case file to her, "thus leaving me nothing to work with."  (*Id.*)

---

[7]Documentary evidence corroborating the filing of a second civil rights charge has not been included in the exhibits provided by either party.

Plaintiff testified that thereafter she met with Sue Benson and Robert Cable, Wayne Regional Director of the Judson Center.  (*Id*. at 70-71.)  It appears that these meetings were memorialized in an undated memo from Robert Cable to Robert Stark.  (Dkt. 26 at Ex. D.)  In the undated memo to Mr. Stark, Mr. Cable states:

> I then spoke with Ms. Grandberry and told her there were no plans to terminate her and that if that were to change I would tell her so.
>
> By Friday December 12, that had changed.  Over the course of several months Ms. Benson described a series of problems:
>
> - negative attitudes expressed toward her, toward Ms. Doyle and toward clients
> - Ms. Grandberry did not respond in a timely and appropriate manner when asked to provide documentation of her medical problem - she accused her supervisor of harassing her.
> - She is believed to have commented to a client that Ms. Doyle is racist - an inappropriate comment to make to a client.
> - She indicated to another client that Ms. Doyle would not approve unsupervised visitation with her children.
> - On 2 occasions she did not follow directions necessary to complete a report in a timely manner.
> - On one occasion she presented a report in court that she knew was not approved by an FIA worker.  When this was discussed with her by Ms. Doyle she took the position that the Referee did not object, therefore there was no problem.

(*Id*. at 1-2.)

With regard to the late report, Mr. Cable states:

> . . .  There was no injury related cause and effect process that prevented Ms. Grandberry from completing the reports.  Ms. Doyle will respond further to this item.  I do not believe there was an actual miscommunication between Ms. Grandberry and Ms. Doyle.  Ms. Doyle was clear.  Ms. Grandberry choose [sic] not to follow the directions she was given.
>
> . . . .
>
> Holding staff accountable for completing reports in a timely manner, presenting appropriately approved Court reports and avoiding making comments to clients that

begin to disrupt the working relationship between the clients and Judson are not, in my opinion, examples of "nit-picking things."

. . . .

. . . The expectations for Ms. Grandberry are no different than for other staff. If staff turn in late reports through failure to follow directions, they are dealt with. I am not aware of any current foster care worker other than Ms. Grandberry who has knowingly submitted a Court report that has not been approved by FIA. I am not aware of any other current foster care worker that has shown the lack of respect for colleagues and for a supervisor that Ms. Grandberry has displayed.

(*Id.*) The memo concludes by saying, "At the moment, Ms. Grandberry stands out from her co-workers in the foster care unit, as a potential termination, because of performance issues." (*Id.*)

Plaintiff testified that she filed another charge[8] with the Michigan Department of Civil Rights at the time that she was terminated and that the complaint was investigated. (Grandberry Dep. at 89.)

### 4.    Racial Composition of Employees Under Colleen Doyle's Supervision

Plaintiff alleges that her termination was part of a conscious plan to eliminate non-Caucasians from Ms. Doyle's supervision. In her December civil rights complaint, she apparently stated she was the only African-American under Ms. Doyle's supervision. (Dkt. 18 at Ex. E.) During her deposition, however, Plaintiff conceded that at least two other African Americans were also under the supervision of Ms. Doyle, working as case aides. (Grandberry Dep. at 55-56.)

During her deposition, Colleen Doyle testified that when she first took the position at Judson Center in 2001, she had four licensing workers under her supervision. (Dkt. 25, Doyle Dep. at 16.) By the time of her deposition, she was supervising six licensing workers. Doyle testified that when she started as a supervisor at Judson, all four of the employees under her

---

[8]Besides mention in Plaintiff's complaint, documentation supporting the filing and outcome of this charge is not included in any of the exhibits submitted for consideration.

supervision were black.  (*Id*. at 30.)  She further testified that of the six licensing workers she currently supervises, three are white, and one is black, and she retains the same case aide.  (*Id*. at 31.)  She testified that she also supervised two case managers, including Plaintiff.  Doyle stated that the other case manager under her supervision was initially a black man, and subsequently a white woman.  (*Id*. at 36.)  After Plaintiff's termination, a second case manager was assigned to Ms. Doyle who was African American.  Doyle testified that this case manager now works in another program, and that the current case manager working under her supervision is Caucasian.  (*Id*. at 33.)

### 5.    Mileage Reporting Discrepancies

In the memorandum directed to Sue Benson from Colleen Doyle dated March 8, 2004, Ms. Doyle summarizes discrepancies said to have been made in Plaintiff's mileage reports.  (Dkt. 18 at Ex. G; *see also* Ex. I, Doyle Dep. at 54-56.)  Ms. Doyle states that in December of 2003, Plaintiff made a trip to a client's home that was not documented at all.  (Dkt. 18, Ex. G at 1.)  Ms. Doyle states that on January 23, 2004, Plaintiff traveled to Grand Rapids, apparently calculating the mileage from the office.  However, Ms. Doyle states that Plaintiff "did not come to the office that day, she commuted to & from Grand Rapids from home."  (*Id*.)  Ms. Doyle then recounts two trips that were said to have taken place on January 26 but did not in fact take place until January 29.  Ms. Doyle states that she had signed the trip report the day before the trips were taken.  She states, "It is inappropriate to request reimbursement for work activity that has not been completed."  (*Id*.)  Ms. Doyle then recounts a trip on January 27, 2004, to transport a client to a shelter home which never occurred.  Plaintiff informed Ms. Doyle that the foster parent, instead of the Plaintiff, would be picking up the child.  Ms. Doyle states that she "specifically remember[s] this conversation as I asked if she had contacted the shelter to authorize Ms. Hudson to pick up the

child as I was worried that they might not release the child to Ms. Hudson." (*Id.*) Plaintiff is stated to have called the shelter and confirmed that the foster parent could pick up the child, which Ms. Doyle verified herself. (*Id.*)

Discrepancies in trips reported for February 3 and 4 are next described by Ms. Doyle. (*Id.* at 1-2.) Regarding a trip entry dated February 3, 2004, Plaintiff admitted to Ms. Doyle on February 25, 2004, that the trip had not yet occurred, but Plaintiff stated that she had taken it off a revised mileage sheet submitted February 19, 2005. Plaintiff told Ms. Doyle she was planning to make the trip later on February 25. With regard to a trip entry dated February 4, 2004, Ms. Doyle recounts that during a conversation with the Plaintiff on February 24, she had not yet received documentation for that trip. Plaintiff is said to have told her that it had been submitted. Ms. Doyle stated that it had not been received and that she needed it by the end of that working day.

On March 1, Ms. Doyle called a client who was to be visited. The client confirmed that Plaintiff had visited during the previous week but could not remember which day, although the client thought it was Wednesday of that week. Ms. Doyle noted that Plaintiff was out of the office that day, and thus, "It is clear that she did not make the home visit on 2/4 as she recorded on the mileage sheet." (*Id.* at 2.) Ms. Doyle then states, "These discrepancies, where [Plaintiff] had submitted mileage requests where trips did not occur, occurred after the form was submitted, or there was a discrepancy as to the start and end point of the trip, create payment to [Plaintiff] of $61.16[.]" (*Id.*) She then states, "[m]ore important [than] the issue of the money is the fact that the agency cannot rely on the truthfulness of the information Ms. Grandberry is providing." (*Id.*) Ms. Doyle points out that Plaintiff had made several home visits, "but not on the date [documented] on the mileage form." (*Id.*) When she asked Plaintiff about these entries, Plaintiff

19

is alleged to have replied that "she creates her mileage sheet as she schedules her home visits. When asked if she updates the mileage sheet if there are changes to her schedule she replied that she assumed that if the visit occurred it would not be a problem.  (*Id.*)

At her deposition, Plaintiff stated that the handwriting on a mileage sheet presented to her by counsel for Defendant was not hers (Grandberry Dep. at 81-82), and that as to a home visit of a client on the 29th,[9] Plaintiff stated, "If she put it there, meaning Ms. Doyle, she put that there, then she must have documentation stating that my home visit was done on the 29th and there was documentation for it but I visited these people twice."  (*Id.* at 82.)  Plaintiff stated that she also made an unscheduled visit apparently on January 26th.  Plaintiff stated that other documentation relating to a client named Ayers showed the wrong date and that she visited this client on the 26th, not the 27th as indicated.  (*Id.*)  Rather, Plaintiff stated that on the 26th she went to the shelter, saw the child, informed him that he was going to a foster home, and submitted documentation.  (*Id.* at 83.)  Plaintiff testified that there may have been duplicate mileage on notations because she filled out mileage sheets more than once.  (*Id.* at 83-84.)  Plaintiff stated that in one case she went to a home visit to the Ayers family, but no one was home.  She also testified that there were entries on the mileage sheet that were not hers and which she could not explain.  (*Id.* at 84.)  Further, she alleged that mileage sheets were missing.  (*Id.* at 85.)

### 6.    Form 3200 Incident – March 2004

In the March 8, 2004, memorandum, Ms. Doyle describes an incident involving the filing of a protective services report known as a Form 3200:

> Also at issue in this report is the protective services report, 3200, being filed.  In supervision on 2/25, Ms. Grandberry was instructed to file a 3200 as one of the Sims girls had a baby.  On the first draft of the court report, I inquired if the report was

---

[9]From the context of Plaintiff's deposition, this testimony appears to refer to January 29th.

made, and if it was, to add it to the report.  If the report was not made, Ms. Grandberry was to make it immediately.  On the second draft of the report, Ms. Grandberry indicated that she had filed the report on 3/2/04.  In fact, Ms. Grandberry had not filed the report.  This was verified by protective services on 3/3/04.  Ms. Grandberry did not contact CPS to file the report until after I contacted CPS on 3/3/04, 7 days after she was directed to do so.

(Dkt. 18, Ex. G at 4.)

In the closing paragraphs of this memorandum, Ms. Doyle summarizes the incident as

follows:

> She failed to follow this directive until I inquired about when she submitted her court report for this case on 3/2/04.  Ms. Grandberry then indicated in the second draft of her court report that she had filed the 3200 on 3/2/04, when in fact she had not.  This was verified by protective services on 3/3/04.  Ms. Grandberry did file the report on 3/3/04.
>
> Judson Center policy and the Child Protection Law require that 3200s are to be filed within 24 hours of receiving information of suspected child abuse or neglect.

(*Id*. at 5.)  After summarizing other matters, the memorandum concludes with a recommendation

that Plaintiff's employment be terminated.  (*Id*.)

During her deposition, Colleen Doyle testified regarding this incident as follows:

A.  There was – excuse me – there was an issue about a 3200, a children's protective services report being filed.

Q.  What was the issue?

A.  Ms. Grandberry was given a directive to file it and it had not been filed.

Q.  Who was this form filed with?

A.  The Department of Human Services.  At that time, Family Independence Agency.

Q.  And it wasn't filed at all?

A.  It was not filed when it was supposed to be filed.  According to Child Protective Services Law, we're supposed to file those within 24 hours of having information of suspected abuse or neglect.  Ms. Grandberry had a

ward, minor ward, who had a baby.  She was instructed to file the 3200 when the baby was born.

Q.   Was that ever filed?

A.   It was filed several weeks later.

(Dkt. 18, Ex. I, Doyle Dep. at 45.)

At her deposition, Plaintiff explained that a form 3200 was used in abuse and neglect cases. (Grandberry Dep. at 85.)  She testified that she completed such a form relating to a child by the last name of Sims, and that she was told to do so by Ms. Doyle.  (*Id*.)  Plaintiff testified that when told to complete the form, she attempted to call Protective Services but could not reach them that day.  Plaintiff stated that she tried to call that office the next day and explain to them "why I was trying to file a 3200 and the supervisor – I do not know her name – told me that, yes, the child is in foster care and she had a child but she is staying with her aunt.  So there is no way I can prove that the child was neglected or abused.  So I could not file the 3200.  Instead, I filled out the 3200 and wrote denied on it, because it couldn't be filed.  I told Ms. Doyle that."  (*Id*. at 86.)  At her deposition, Plaintiff testified:

Q.   Is it your understanding that a 3200 has to be filed within 24 hours of receiving information about the child?

A.   I believe so.

Q.   Weren't you told by Miss Doyle to file the 3200?

A.   Yes.

Q.   And yet you did not do that?

A.   As I stated before, I called P.S.  I couldn't get through.  So I called the next day.

Q.   Did you let Miss Doyle know that, that you had called Protective Services?

A.    Yes, I did.

Q.    What did she say?

A.    I told her the next day what happened.  She and I both know it's hard to get through to P.S., Protective Services.  So I told her what happened and she spoke with the supervisor.

Q.    Of Protective Services?

A.    Yes.

Q.    Who was that?  Do you recall?

A.    I don't know.

Q.    How do you know she spoke with the supervisor?

A.    Because I told her and I gave her the number.

Q.    You don't know exactly that she called her?

A.    Yes, I did, because I was standing there.

Q.    That's what I am asking.  You were standing there when she did it?

A.    Yes.

Q.    How many days after you were told by Miss Doyle to file this 3200, how many days later was it that you let Miss Doyle know that you were trying to get ahold of Protective Services?

A.    I don't recall.

(Grandberry Dep. at 86-88.)

**D.    Defendant's Motion for Summary Judgment**

In its motion, Defendant challenges Plaintiff's assertion of federal jurisdiction, arguing that Plaintiff cannot establish a prima facie case of racially-based employment discrimination. Defendant contends that the reasons underlying its termination of Plaintiff's employment are legitimate, non-discriminatory, and not a pretext for discrimination.  Attached to the instant motion

23

are exhibits including copies of Plaintiff's at-will employment agreement, portions of her deposition, various memoranda relating to her employment, a copy of a Michigan Department of Civil Rights claim, her termination letter, and portions of the deposition transcript of Plaintiff's supervisor, Colleen Doyle.

Plaintiff's termination letter is dated March 11, 2004, signed by the Judson Center Director of Human Services, and states in pertinent part the following:

> After careful review of the evidence, it has been decided to terminate your employment with Judson Center, effective immediately. You are aware that Judson Center is an At-Will employer, and, as such, may terminate your employment at any time without cause. However, due to recent circumstances, I feel obligated to provide assurance that this action was not taken as retaliation for any complaints you have made to the State of Michigan Department of Civil Rights. This decision was made on the basis of the following matters:
>
> • Unprofessional behavior in your interaction with peers and consumers.
> • Insubordinate behavior toward your supervisor.
> • Submitted fraudulent mileage forms for reimbursement.
> • Knowingly provided your supervisor with inaccurate information about casework.
> • Violated Judson Policy and the Child Protective Services statute.

(Def.'s Mot. at Ex. H.)

Plaintiff responds that she has fulfilled every element of a prima facie case for employment discrimination. Plaintiff argues that Ms. Doyle's refusal to accept scheduling documents from the Plaintiff after she suffered an injury, the discipline handed out by Ms. Doyle, Ms. Doyle's refusal to assist Plaintiff as a result of her injury, and various admissions by Ms. Doyle with regard to Plaintiff's attendance all corroborate the existence of discriminatory animus, as well as proof that the stated reasons for Plaintiff's dismissal are not legitimate, but in fact are pretext for Defendant's discriminatory actions. Filed with Plaintiff's response are excerpts of Plaintiff's deposition, as well as that of Colleen Doyle.

Defendant's reply reiterates its denial of Plaintiff's allegations. Attached to the reply are additional excerpts of the Colleen Doyle deposition, as well as e-mails, memoranda, and Colleen Doyle's affidavit. (Reply, Dkt. 26.) Attached to Plaintiff's supplement (Dkt. 28) are copies of a performance evaluation of Plaintiff, various letters drafted by Plaintiff, and another copy of Michigan Department of Civil Rights materials. Defendant's reply to Plaintiff's supplementation (Dkt. 29) argues that the supplement's exhibits should not be considered.[10]

### E.   Governing Legal Standards

### 1.   Motion Standards

A motion for summary judgment will be granted under Rule 56(c) of the Federal Rules of Civil Procedure where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). All facts and inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an

---

[10]In its reply, Defendant correctly argues that in this circuit, under Rule 56(e) of the Federal Rules of Civil Procedure, "documents submitted in support of a motion for summary judgment must satisfy the requirements of Rule 56(e), otherwise, they must be disregarded." *Moore v. Holbrook*, 2 F. 3d 697, 698-99 (6th Cir. 1993). In this circuit, unsworn statements and unverified documents may not be used to support or defeat a motion for summary judgment. *Cacevic v. City of Hazel Park*, 226 F. 3d 483, 489 (6th Cir. 2000). Under these standards, I conclude that four of the proffered exhibits may be properly considered. Exhibit 1 is the previously described "Foster Care Case Manager Performance Evaluation" dated November 21, 2003. This document bears the signature of both Plaintiff and Ms. Doyle. It is consistent with both deposition testimony and representations made at oral argument. Its format, along with its signatures, clearly evidences its potential admissibility within the meaning of Rule 56(e). Exhibits 2 and 3 are both memoranda signed by Plaintiff and attached to complaints made to the Michigan Civil Rights Commission. I conclude that they are sufficiently verified to deserve consideration within the meaning of Rule 56(e). Exhibit 4 is the official "Statement of Concern" from the Detroit Office of the Michigan Civil Rights Commission. It appears on official Michigan stationery and bears every indicia of authenticity. It has therefore been considered pursuant to Rule 56(e). Exhibits 5, 6 and 7, I cannot verify or link to any other exhibit, affidavit or deposition testimony. Exhibit 5 is entitled "Response for Exhibit #C." Exhibit 6 is entitled "Response for Exhibit #B." These two documents are unsigned. I conclude they fail to meet the standards of Rule 56(e) and will not be considered. Exhibit 7 is the final page of the previously described March 8, 2004, memorandum to Sue Benson from Colleen Doyle. (Dkt. 18 at Ex. G.) It is redundant with that exhibit.

essential element of the non-movant's case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citing *Celotex Corp. v Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 326.

In response, the non-moving party cannot rest merely on the pleadings alone. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When the nonmoving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. Instead, the court will rely upon the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992). The Sixth Circuit explicitly instructed that it is "utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion." *Id.* at 406.

After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52).

Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### 2.   Title VII Standards

In Title VII actions, "a plaintiff may establish discrimination either by introducing direct evidence of discrimination or by proving inferential and circumstantial evidence which would support an inference of discrimination." *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). When using circumstantial evidence to create an inference of discrimination, the complainant must carry the initial burden of establishing by a preponderance of the evidence a prima facie case of discrimination by his or her employer.

In evaluating a claim of employment discrimination, federal courts employ the burden-shifting approach first announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252- 53, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)*; Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 906 (6th Cir. 2002). Applying the *McDonnell Douglas,* formulation to the context of this case, in order to establish a prima facie case, the plaintiff must show that (1) she was a member of a protected class, (2) she was discharged, (3) she was qualified for the position, and (4) she was replaced by a person outside the protected class. *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992).

A plaintiff who successfully establishes a prima facie case receives the benefit of a presumption that the employer unlawfully discriminated against him or her. *Burdine* at 254. The burden then "shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.* at 253 (quoting *McDonnell Douglas*, 411 U.S. at 802). Finally, "should the defendant carry this burden, the plaintiff must then have an opportunity to prove by

a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id*.  Throughout this burden-shifting framework, applicable when circumstantial evidence is involved, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id*.; *see also Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995).

### F. Analysis & Conclusions

### 1. Title VII Claims

### a. Direct Evidence of Discrimination

In this case, Plaintiff contends that she has come forward with direct evidence of discrimination.  "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 926 (6th Cir. 1999).  "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.,* 319 F.3d 858, 865 (6th Cir. 2003).  "[A]n employee who has presented direct evidence of improper motive does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action." *Weigel v. Baptist Hosp. of E. Tenn.,* 302 F.3d 367, 382 (6th Cir. 2002).  "Rather, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Id*.

After review of Plaintiff's complaint, the instant motion, the exhibits submitted, and Plaintiff's deposition, I suggest Defendant is correct that Plaintiff has failed to present direct

28

evidence of discrimination within the meaning of Title VII. Plaintiff conceded in her deposition testimony that no supervisor or employee of Judson ever made a comment related to her race, (*see* Grandberry Dep. at 100-01), and I am unable to discern how any of the evidence presented and described in detail above "requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn,* 176 F.3d at 926.

**b.   Circumstantial Evidence of Discrimination**

In the absence of direct evidence of discrimination, a plaintiff must make his or her case under the burden-shifting standards set forth in *McDonnell Douglas* as summarized above, through the use of circumstantial evidence, having in mind that "[t]he ultimate burden . . . remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

I first note that Plaintiff was an at-will employee, and acknowledged as much in her deposition. (Grandberry Dep. at 35.) In Michigan, employment at will can be terminated for any reason or no reason at all.[11] *See Rood v. General Dynamics Corp*, 444 Mich. 107, 116; 507 N.W. 2d 591 (1993); *Clement-Rowe v. Michigan Health Care Corp*, 212 Mich. App 503, 506; 538 N.W. 2d 20 (1995). While this fact does not preclude Plaintiff from claiming violations of her civil rights, *see Burton v Plastics Research Corp.,* 134 F. Supp. 2d 881 (E.D. Mich. 2001), I suggest that the nature of her employment relationship clearly informs each step of the *McDonnell Douglas* burden-shifting formula.

Applying the *McDonnell Douglas* formulation, I first conclude that Plaintiff has established the first three elements of a prima facie case. She is within a protected class, was terminated, and

---

[11]Michigan does recognize a "public policy" exception under which an at-will employee may not be discharged for "failure or refusal to violate a law in the course of employment." *See Suchodolski v. Michigan Consol. Gas Co.*, 412 Mich. 692, 695, 316 N.W.2d 710, 711 (1982). However, the record is entirely devoid of any evidence supporting the application of this exception.

after completing the FIA Child Welfare Institute training, was fully qualified for her job. However, I suggest that Plaintiff has failed to make out the fourth element  – that she was replaced by a person outside the protected class.  When asked about the allegation in her complaint that she was replaced by a non-African-American, Plaintiff stated she had no idea who actually replaced her.  (Grandberry Dep. at 100.)  To the contrary is Ms. Doyle's affidavit, in which she states that she took over Plaintiff's workload for about two to three months after Plaintiff's termination, and then another African-American was hired to fill Plaintiff's position.  (Dkt 26, Ex. B, Doyle Aff. ¶ 10.)

Plaintiff could also establish the fourth prong of the prima facie case by showing that she was treated less favorably than a similarly-situated employee outside of the protected class. *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002).  In such a case, plaintiff must prove that all relevant aspects of her employment situation are similar to those of the employee(s) with whom she seeks to compare herself.  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).  In *Mitchell*, *supra*, the Sixth Circuit set out the standard for evaluating whether a protected plaintiff is similarly situated to the proffered more favorably treated employees:

> It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the "comparables" are similarly situated in all respects. Thus, to be deemed "similarly situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Id*. at 583 (internal citations omitted).

The only specific allegation of favorable treatment I can find in this record explicitly naming other employees is Plaintiff's deposition testimony that two other employees were released

30

early on November 21, 2003 (Grandberry Dep. at 54-55), and an apparent mention in her November 20, 2003, memo of another foster care case manager who got promoted. (Dkt 28, Ex. 2 at 3.)  However, Plaintiff conceded that the employees who were released early were not under Ms. Doyle's supervision (*Id.* at 55), and the November memo gives no indication who supervised the case manager there mentioned.  I therefore suggest that Plaintiff has failed to meet her burden of establishing a  racially motivated retaliation claim, and that as a result, this alternative method of proving her prima facie case fails.

A prima facie case can also be established by showing that Plaintiff suffered retaliation resulting from her exercise of protected activity.  To prove a claim of retaliation, plaintiff must demonstrate that (1) she engaged in protected activity; (2) the exercise of her civil rights was known by defendant; (3) defendant thereafter took an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action.  *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 552-53 (6th Cir. 2002); *Thatcher v. Goodwill Industries of Akron*, 117 Ohio App. 3d 525, 534-35, 690 N.E.2d 1320, 1326 (1997). The burden of establishing a prima facie case of retaliation "is not onerous, but one easily met."  *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

To establish a causal connection, plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had plaintiff not filed a discrimination charge. *Id.* Evidence that the defendant treated the plaintiff differently from similarly-situated employees or that the adverse action was taken shortly after the plaintiff's exercise of his protected rights is relevant to causation.  *Id.*  (citing *Moon v. Transp. Drivers, Inc.*, 836 F.2d 226, 230 (6th Cir. 1987)); *see also Ford*, 305 F.3d at 554-55.  The Sixth Circuit has stated that while "'temporal proximity alone will not support an inference in the face of compelling

31

evidence' to the contrary, 'the proximity in time between protected activity and adverse employment action may give rise to an inference of a causal connection.'" *Ford*, 305 F.3d at 554-55 (quoting *Moon*, 836 F.2d at 229).

Under these standards, I suggest that while Plaintiff has made out the first three elements, the evidence fails to meet her burden on the fourth element. The evidence establishes that Plaintiff engaged in protected activities (the filing of complaints with the Michigan Department of Civil Rights), that her employer knew she had done so, and that thereafter adverse actions were taken. However the evidence fails to substantiate any causal connection. In her deposition, Plaintiff acknowledged she did not post schedules as directed, did not file reports in a complete and timely fashion, that there were discrepancies in her mileage forms, and that she failed to file the Form 3200 within the time limits required as she was directed to do by her supervisor. Every one of these acts are violations of Judson policies and procedures known to the Plaintiff and communicated to her on more than one occasion. I am unable to conclude that any of these are mere subterfuges hiding discriminatory malice, especially in light of her admissions, coupled with her at-will employment status. I suggest that the unfavorable employment actions resulting from these policy violations would have taken place irrespective of her engaging in the protected act of filing civil rights complaints. As a result, I suggest that Plaintiff has failed to make out a prima facie case under Title VII, under any alternative theory.

### c.      Legitimate Non-Discriminatory Reasons

Presuming, for the sake of completeness and judicial economy on review, that plaintiff has established a prima facie case, the burden shifts to the defendant to establish a legitimate reason for the adverse action, which plaintiff may then rebut by producing credible evidence of pretext. *Jackson v. Pepsi-Cola, Dr. Pepper Bottling Co.*, 783 F.2d 50, 54 (6th Cir. 1986). An employer's

burden of showing a legitimate non-discriminatory reason for its actions is not particularly onerous. It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory. *See Seils v. Rochester City Sch. Dist.*, 192 F. Supp. 2d 100, 111 (W.D.N.Y. 2002) (citing, *inter alia*, *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985)). "[C]ourts do not sit as super personnel departments to second guess an employer's facially legitimate business decisions," *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1007 (7th Cir. 2002), *accord Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991), and unless Plaintiff can present evidence of racial animus, the Court will not overturn an employment decision, even if the Court might have acted differently had it been the employer. *See, e.g., Ang v. Procter & Gamble Co.*, 932 F.2d 540, 549 (6th Cir. 1991); *Wilkins v. Eaton Corp.*, 790 F.2d 515, 521 (6th Cir. 1986); *Jones v. Delphi Packard Elec. Sys.*, No. 99-3294, 2000 WL 282896 (6th Cir. March 13, 2000) (unpublished).

Under these standards, I suggest that Plaintiff's unwillingness to follow Judson Center policies regarding the posting of schedules, requests for mileage disbursements, the completion of reports and filing of forms are undeniably legitimate and non-discriminatory reasons for terminating her employment. *See, e.g., Costello v. St. Francis Hosp.*, 258 F. Supp. 2d 144, 155 (E.D.N.Y. 2003) ("falsification of a time sheet can constitute a legitimate, nondiscriminatory reason for terminating an employee"); *Sanyer v. Kimberly Quality Care*, 971 F. Supp. 86, 89 (E.D.N.Y. 1997) (employee's lateness, submission of an inaccurate time sheet, failure to seek authorization to leave early, and failure to notify supervisor regarding absences are legitimate, non-discriminatory reasons for her discharge); *Gomez v. Pellicone*, 986 F. Supp. 220, 228 (S.D.N.Y. 1997) (employee's falsification of time records and other misconduct were legitimate

and nondiscriminatory reasons for her termination). This is particularly so in light of Plaintiff's at-will employment status and the admissions appearing in her deposition.

Judson Center's letter terminating Plaintiff's employment and the earlier March 4, 2004, memo both cite interpersonal conflicts as a reason for Plaintiff's termination. (Dkt. 18, Exs. G, H.) Numerous federal discrimination cases analyzed under the *McDonnell Douglas* framework have held that legitimate, non-discriminatory reasons for discharging a plaintiff-employee can include that individual's poor interpersonal skills, uncooperative behavior, inability to get along with others, or bad attitude in general. *See, e.g., Thomson v. Saatchi & Saatchi Holdings (USA), Inc.*, 958 F. Supp. 808, 822 (W.D.N.Y. 1997) (defendants' legitimate, non-discriminatory reasons for plaintiff's discharge included plaintiff's failure to "get along with his colleagues and subordinates," and "complaints about plaintiff's personality from one of defendants' largest clients"); *Ebbin v. Indep. Television Network*, No. 95 Civ. 10097, 1997 WL 441943, at *4 (S.D.N.Y. Aug. 5, 1997) (personality or attitude are legitimate non-discriminatory reasons for dismissal); and *Reed v. Conn., Dep't of Transp.*, 161 F. Supp. 2d 73, 84 (D. Conn. 2001) (employee's record of "disruptive" and "insubordinate and uncooperative" behavior, prior written reprimands, and "'needs improvement' rating for his interpersonal skills" were legitimate, non-discriminatory rationale for employer's failure to promote him). *See also Simpson v. Ernst & Young*, 879 F. Supp. 802, 817 (S.D. Ohio 1994) (legitimate, non-discriminatory reasons for ERISA plaintiff's discharge included his "poor attitude"). The federal discrimination statutes bar retaliation against the exercise of protected rights; "they do 'not clothe the complainant with immunity for past and present inadequacies, unsatisfactory performance, and uncivil conduct.'" *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 828-29 (1st Cir. 1991) (quoting *Jackson v. St. Joseph State Hosp.*, 840 F.2d 1387, 1391 (8th Cir. 1988)).

34

It also does not matter whether the plaintiff's attitude was caused by the behavior of her coworkers. *See Allen v. City of Yonkers*, 803 F. Supp. 679, 708 (S.D.N.Y. 1992) ("Conflicts with those in authority may constitute valid reasons for discharge, whether or not the conflict entails fault on the part of the employee."). Furthermore, in this circuit, the mere perception that an employee has a bad attitude is sufficient grounds for his termination. *See Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1044 (6th Cir. 1992) (where plaintiff "was perceived as being out for himself rather than being a company man," defendant had legitimate reason for terminating him). Again, Plaintiff's at-will status heightens the force of these principles.

### d.    Pretext

Presuming for the sake of completeness that the case proceeds to the third step of the *McDonnell Douglas* analysis, I note that in this circuit, different evidentiary bases for three types of pretext showings have been identified: 1) defendant's reasons had no basis in fact; 2) the reasons did not actually motivate the discharge; or 3) the reasons were insufficient to warrant a discharge. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). The first type of showing consists of evidence that the reason offered for the plaintiff's discharge never happened, i.e., that the reason is factually false. *Id.* The third showing ordinarily consists of evidence that other employees, particularly those outside the protected class, were not discharged even though they engaged in conduct substantially identical to that which purportedly motivated the plaintiff's discharge. *Id.* If the plaintiff establishes the first or third showing, a permissive inference of discrimination arises. *Id.* For the second showing, where the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal, plaintiff must introduce additional evidence of discrimination because

the reasons offered by the defendant are not directly challenged and therefore do not bring about an inference of discrimination. *Id.*

Although the court should refrain from probing an employer's business judgment, business judgment is not an absolute defense to unlawful discrimination. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (citing *E.E.O.C. v. Yenkin-Majestic Paint Corp.*, 112 F.3d 831, 835 (6th Cir. 1997)). The Court in *Wexler* addressed the extent to which a fact-finder may consider the reasonableness of an employer's decision: "[T]he reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." Wexler, 317 F.3d at 576. *See also Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998) (holding that, in evaluating a proffered nondiscriminatory basis for an employment action, courts should inquire into "whether the employer made a *reasonably informed and considered decision* before taking an adverse employment action") (emphasis added); *In re Lewis*, 845 F.2d 624, 633 (6th Cir. 1988) ("Sears does not have to establish that the basis on which it acted in firing Lewis was sound; rather, Lewis has the burden of demonstrating that Sears' stated reasons are pretextual. One way for Lewis to do this is to show that Sears' asserted business judgment was so ridden with error that defendant could not honestly have relied upon it.") (internal quotation marks omitted).

Under these standards, I cannot find the actions taken by Judson to be pretextual, particularly in light of Plaintiff's at-will employment status. They are, I suggest clearly well-considered, evidencing use of a "progressive discipline" format. While Plaintiff disputes many details of Judson's accusations, I suggest they are clearly not "so ridden with error that defendant could not honestly have relied upon it." *In re Lewis*, *supra*. I therefore suggest that Plaintiff has failed to meet her burden of showing pretext.

**2.      42 U.S.C. § 1983 Claims**

Plaintiff claims that Defendant is liable for racial discrimination under the Civil Rights Act of 1964, 42 U.S.C. § 1983.  The essential elements of a claim under 42 U.S.C. § 1983 are that the conduct complained of (1) was committed by a person acting under color of law, and (2) deprived the plaintiff of rights, privileges or immunity secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S. Ct. 1908, 451 U.S. 527 (1981), *overruled on the grounds by Daniels v. Williams*, 474 U.S. 327 (1986); *Berger v. City of Mayfield Heights*, 265 F.3d 399, 405 (6th Cir. 2001).  Absent either element, a section 1983 claim will not lie." *Christy v. Randlett*, 932 F.2d 502, 504 (6th Cir. 1991).  "[A] section 1983 claim can only be brought for actions done under color of state law." *Ortman v. Thomas*, 894 F. Supp. 1104, 1110 (E.D. Mich. 1995).  In order to withstand dismissal, the Plaintiff in this case must show that the Judson Center acted "under state law."  The "color of state law" determination is coterminous with status as a "state actor." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935, 102 S. Ct. 2744, 2752, 73 L. Ed. 2d 482 (1982); *Moore v. City of Paducah*, 890 F.2d 831, 833 (6th Cir. 1989).  Beyond alleging that Defendant has a contractual relationship with the state, Plaintiff provides no basis to support a determination that Defendant is in fact a state actor for the purposes of 42 U.S.C. § 1983.  The mere existence of a contract between a governmental agency and a private party is insufficient to create state action. *Dobyns v. E-Systems, Inc.*, 667 F.2d 1219, 1227 (5th Cir. 1982); *Simescu v. Emmett Co. Dept. of Soc. Servs.*, 942 F.2d 372 (6th Cir. 1991).  Plaintiff's entirely conclusory allegations in this regard, I suggest, are insufficient.

Alternatively, I suggest that, even if Defendant Judson were found to be an agency of the State of Michigan, this count of Plaintiff's complaint fails to pass muster under the Eleventh Amendment to the United States Constitution.  Plaintiff has elected to sue no individuals, only a

corporate entity, and as the United States Supreme Court has made clear, Congress did not abrogate this amendment when it enacted § 1983. Thus, even if Defendant Judson Center were to be found a state actor, neither the state nor a state agency is a "person" subject to suit under § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 66-71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). I therefore suggest that Defendant's motion be granted on this count, and that it be dismissed.

### 3.      Pendent State Claims – Counts II, IV and V

These three counts all allege violation of state law; i.e., Michigan's Elliott-Larson Civil Rights Act ("ELCRA"). This court has no original jurisdiction over these claims. A district court may decline to exercise jurisdiction over such a claim if it has dismissed all of the claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). The Supreme Court has instructed that, as a general rule, if the claims over which the court has original jurisdiction are dismissed before trial, the state claims should be dismissed as well. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966); *Taylor v. First of Am. Bank-Wayne*, 973 F.2d 1284, 1287 (6th Cir. 1992).

These cases teach that the decision to dismiss and remand such claims is informed by factors such as judicial economy, convenience, fairness, and comity. Here, since I have suggested that summary judgment be granted to Defendant as to Plaintiff's federal claims, I further suggest that the factors outlined above do not favor this Court's retention of jurisdiction over the state law claims. I therefore suggest that it is appropriate for this Court to dismiss Plaintiff's remaining state law claims.

## III.   REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.


                                             s/ *Charles E Binder*
                                             CHARLES E. BINDER
Dated: December 20, 2005                      United States Magistrate Judge


## CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date, electronically served on Robert J. Figa, Robert R. Stearns, Christopher J. Trainor and Ernst Wendl, and served in the traditional manner on Honorable David M. Lawson.


Dated:  December 20, 2005                    By    s/Mary E. Dobbick
                                             Secretary to Magistrate Judge Binder